CHARLES WALKER, *Plaintiff in Error*, v. THE STATE OF FLORIDA, *Defendant in Error*.

Opinion Filed December 19, 1921.

1. Where the testimony shows an elaborate and well conceived plan to burn a house with intent to injure an insurance company, and the house is actually burned as the result of such plan, it is no defense that the fire did not occur in just the manner in which it was planned.

2. Where a motive and desire to have property destroyed by fire is shown, and a well conceived plan to carry out the desire, and an opportunity to carry out the plan, and the house burns as a result of the plan, although not exactly in accordance with it, a conviction will be sustained.

3. Where a trial judge is advised that improper influences are being exercised either for or against a defendant, it is proper for him to apprise the jury of such fact, and caution them against such sinister influences, and warn them to remain entirely away from any conversation between or with any individuals in relation to the case on trial.

4. On the authority of the case of Vasques v. State, 54 Fla. 127, it is held that the omission of the words "or lack of evidence" from an instruction that "doubt which is not suggested by or does not arise from the evidence is no reasonable doubt, and should not be considered," is not reversible error.

5. The instruction that "a doubt which is not suggested by or does not arise from the evidence is no reasonable doubt, and should not be considered," approved in the Vasques case, would state the rule more clearly, and remove all criticism, if the words "or lack of evidence" were included in it.

A Writ of Error to the Circuit Court for Manatee County; O. K. Reaves, Judge.

Judgment affirmed.

*John B. Singletary,* for Plaintiff in Error;

*Rivers H. Buford,* Attorney General, and *J. B. Gaines,* Assistant, for the State.

BROWNE, C. J.—Charles Walker and Eunice Walker were jointly indicted for burning a certain insured vacant dwelling house, belonging to Ida J. Walker, the wife of Charles Walker, with intent to injure the Phoenix Insurance Company, a corporation. Eunice Walker was acquitted under instruction by the court, and Charles Walker brings here for review by writ of error, the judgment of conviction against him.

We will discuss first those assignments of error relating to the sufficiency of the evidence.

It appears from the testimony that about a month before the fire, the defendant moved from Bradentown to Plant City, leaving the house vacant. About two and a half months before the fire, Walker increased the fire insurance on the house from $1,000.00 to $3,000.00.

The electric meter had been removed, but connection was re-established by means of high tension automobile .

wire, and the wires were charged with electricity at the time of the fire. The defendant Eunice Walker had been employed in an automobile garage.

Two or three weeks before the fire the defendants were seen at the house that was subsequently burned, and Clyde Amlong testified to this occurrence: "As I was going home they hollowed to me just as they usually did and they motioned to me that way (indicating) and said 'come here,' and I backed up in the yard and they said—Charlie Walker said: "How low down are you?' and I said, 'just as low as they ever get to be.' I thought he was just joking. And he said, 'Well I'll give you a hundred dollars to melt that down.' He pointed to the house. And I said, 'I don't believe I am as low down as I thought I was,' and then he went ahead talking and told about how it could be done, and finally said, 'I'm sorry I told you,' and I said 'I am too." Eunice joined in that conversation. He said some things about how it could be done. They said they could use gasoline and kerosene and an alarm clock and electric lights. As well as I remember that was all they said they would use. I told them I wouldn't do it. I said, 'Well, you are a damned fool.' The remarks made by him and me were: He says: 'I am sorry I told you,' and I said, 'I'm sorry too."

The fire alarm was sent in about 9:30 the morning of August 20th, and the fire was soon extinguished.

An alarm clock with a bent nail piercing it was found on the floor with the burnt laths and cinders that had fallen from the ceiling.

Above the place where the fire occurred were found three five gallon cans, all open, one almost full of gasoline, and two almost full of kerosene oil. One of the cans was

just across the rafters, and one next to it, where the electric switch was. A tin can with electric wires soldered to it was found close to the can containing the gasoline.

The Chief of the Fire Department testified in part: Upon examining the alarm clock, I found that it had apparently been nailed to hold the clock down in place and the electrical switch could have been attached to the alarm clock in such a way as to break the circuit that was in the house or to make the circuit, causing the small wires which was in the small cans to become red hot, and ignite the gasoline in the can. To ignite the gasoline in the small can would ordinarily ignite the gasoline in the large cans, which were sitting against the small cans with their screw tops off.''

There seems to have been an elaborate and well conceived plan to burn the house by means of the appliances and material found there when the firemen extinguished the flames. It does not appear, however, that the fire occurred in just the way in which it was planned. There was testimony, however, from which the jury could find that the fire was caused by the electric current, and there is evidence to justify the conclusion that the current was turned on by means of the alarm clock operating the switch.

The damage to the house was only $81.00, which the insurance company paid to Charles Walker. The house and lot were sold shortly after the fire for $2,000.00, less the amount paid by the insurance company for the damage to the house.

The salient facts are, that the plaintiff in error increased the insurance from $1,000.00 to $3,000.00, a short time before the fire; that the house was only damaged $81.00,

and the house and lot were sold for $1,989.00, a month thereafter; that after the meter had been removed connection between the outside wires and those in the house was re-established by the use of high tension automobile wire; that one of the defendants had been employed in an automobile garage; that the two defendants below, were seen at the house after it had been vacated; that they tried to bribe Clyde Amlong to burn the house down; ("melt it down" being the term used); the fire originated at or near the switch, and there was evidence to justify the conclusion that the fire was caused by the electric current from the wires.

It was proven by the State's witnesses that an alarm clock of the type found in the building could not be set to operate an electric switch for a period longer than twelve hours. From this it is contended with much plausibility that because no witness testified to seeing either of the defendants in Bradentown later than about four o'clock the afternoon before the fire, if the fire occurred by the use of the alarm clock opening the electric switch, it could not have been arranged by either defendant.

The mere fact that neither of the defendants was seen in Bradentown after four o'clock on the afternoon of the 19th of August does not conclusively establish that they were not there later than that hour, or that they were not at the house at a later hour.

Although the plan seems to have been to burn the house by igniting gasoline in the small can to which wires were soldered, which in turn would ignite the gasoline and kerosene in the large cans, it appears that this plan did not work, but the fire originated from the electric current coming into contact with the wood-work.

It burned from the middle of the ceiling to the west wall, and then extended down inside the partition, to the floor. As this smouldering could have been going on for several hours, there is nothing inconsistent with the theory that the clock was set to turn the electric switch several hours before the fire alarm was sounded.

Charles Walker was shown to have a motive and a desire for the property to be destroyed by fire; a well conceived plan to carry out the desire; an opportunity to carry out the plan, and the house was burned as a result of the plan, although perhaps not exactly in accordance with it.

It is true that on some of these material points, the testimony was conflicting, but the jury decided which testimony to believe, and we cannot say that they were not governed solely by the evidence.

The next assignment of error is based upon the instructions given to the jury when the court was about to adjourn for the night.

The judge told the jury that "it was not ordinarily the custom except in capital cases to keep the jury together in charge of a bailiff, and that he would not require them to remain together in this case." He further charged them that they must not only "be absolutely free from improper influence, but we must conduct ourselves so as to avoid any suspicion of improper influence   In other words, in language with which some of you are familiar, we must avoid the very appearance of evil." The court then charged them "to remain entirely away from any conversation between or with any individuals in relation to the case now on trial; and if anybody approaches you in connection with it I want you to let me know,. and I will do the balance. In order that you may understand

fully why I caution you in this case so emphatically it is proper for me to say that complaint has come to me of some outside influence said to be attempted to be worked upon some of the witnesses. I do not know what interests are especially concerned in this case, nor in any case. I am only cautioning you gentlemen in this particular in order that you may understand the seriousness of the matter and govern yourselves with discretion.''

Exception was taken by the defendant to this instruction ''because it might tend to prejudice the jury against the defendant, and lead them to believe or suspect that he was concerned in the exercise of such improper influence.''

We do not find that the language of the instruction is open to that criticism. If the court was advised that improper influences were being exercised, either for or against the defendant, it was his duty to warn the jury in the manner in which he did, and we think that his instruction was fair and impartial.

The 9th ground of the motion for a new trial is predicated upon the instruction to the jury on reasonable doubt in which this language is used: ''A doubt which is not suggested by or does not arise from the evidence is not a reasonable doubt, and should not be considered.''

It is contended that the words ''or lack of evidence'' should have been included in the charge. While there seems to be much force in this contention, this court in the case of Vasquez v. State, 54 Fla. 127, 44 South. Rep. 739, held that the absence of these words is not grounds for reversal; notwithstanding a reasonable doubt as to a person's guilt may arise more readily from lack of evidence than from evidence itself. '

We are not prepared to overrule the Vasquez case, *supra*, but we think if the charge on reasonable doubt always contained the additional words "or lack of evidence," it would state the true rule more clearly, and remove all criticism that the instruction without those words is misleading, and tends to prejudice the rights of a person on trial.

Finding no reversible error, the judgment is affirmed.

TAYLOR, WHITFIELD, ELLIS AND WEST, J. J., concur.